█ In the Matter of the Estate of FRANCIS M. ROBINSON, Deceased. ROBERT M. KAVANAUGH, as Conservator of the Property of EDITH K. ROBINSON, Respondent; COLUMBIA-GREENE HUMANE SOCIETY, INC., et al., Appellants. — Appeal from an order of the Surrogate's Court of Columbia County (Battisti, Jr., S.), entered April 20, 1983, which vacated a previous decree of said court admitting to probate an instrument purporting to be the last will and testament of the deceased and dismissed probate of said will on the basis of lack of testamentary capacity. ¶ The decedent, Francis M. Robinson, a resident of Columbia County, died on March 4, 1980 in an Arizona hospital. In September, 1978, the decedent had executed a will which named Armour C. Miller as executor and left his entire estate to his wife, Edith Robinson, who suffers from Alzheimer's disease, is confined to an institution, and cannot care for herself or her own affairs. During the early winter months of 1980, while the decedent was in Arizona, a new will was drawn by an Albany, New York, attorney. This document created two trusts for the benefit of Edith if she survived and, upon her death, the trustees were directed to distribute the trusts' assets to Edith's brother, if living, and various charitable organizations. Miller was named as executor with Miller and Key Trust Company designated as cotrustees. On March 4, 1980, the decedent, while on his deathbed some 32 minutes before he was pronounced dead, purportedly executed this will by making his mark. ¶ This later will was offered for probate in Columbia County by Miller. Because of Edith's condition, a guardian ad litem was appointed on her behalf and, after reviewing the file, this guardian consented to the probate of the will. By decree dated April 30, 1980, the Surrogate admitted the will to probate. Thereafter, Robert M. Kavanaugh, who previously had been appointed conservator of Edith's property, sought to vacate the decree admitting the March 4, 1980 will to probate and to deny probate. A hearing was ordered and, thereafter, the Surrogate, finding that Miller had failed to disclose certain facts which would have caused the guardian ad litem to undertake a more extensive investigation into the circumstances surrounding the execution of the will, vacated the prior decree admitting the March 4, 1980 document to probate and concluded that this will was invalid for lack of testamentary capacity. This appeal by the charitable organizations designated in the March 4, 1980 will to share in the estate upon Edith's death followed. ¶ The Surrogate has inherent power to vacate its decree for sufficient reason and in the interest of justice (see *Matter of Samson*, 60 AD2d 964, 965; 25 Carmody-Wait 2d, NY Prac, § 149:294, p 358), such as misconduct in the form of lack of full disclosure (see *Matter of Shonts*, 229 NY 374, 382; see, also, CPLR 5015, subd

[a], par 3; SCPA 102). The record reveals that Miller, although aware of facts casting serious doubt upon the truth of the subscribing witnesses' depositions concerning the execution of the March 4, 1980 will in accordance with statutory requirements, propounded the will based on these depositions without revealing to either the Surrogate or the guardian ad litem the additional facts of which he was aware. For example, the deposition of subscribing witness Marjorie Cramer states that the decedent declared the will to be his last will and testament at the time he signed it, that she signed her name at the decedent's request, and that, in her opinion, the decedent was "of sound mind, memory and understanding, not under any restraint or in any respect incompetent to make a will". Cramer's subsequent testimony, however, reveals that the decedent did not declare the document to be his last will and testament that the decedent did not request her to act as a witness and that, in her opinion, the decedent was not competent to understand the terms of the will when his mark was made. The record further reveals that Miller closely monitored the decedent's condition on March 4, 1980, through a number of telephone calls to Cramer, among others, including the decedent's physician, and was aware of the decedent's deteriorating condition. Miller further testified that after he arrived in Arizona on March 5, 1980, he discussed the execution of the will with the two subscribing witnesses and knew that the will was signed some 32 minutes before the decedent was pronounced dead. None of these circumstances was revealed to the Surrogate or to the guardian ad litem, who testified that had he been aware or informed of such facts, he would have undertaken a more thorough investigation concerning the execution of the March 4, 1980 will. Based on these facts, the Surrogate did not abuse his discretion by vacating the prior decree (see *Matter of Shonts, supra*). ¶ We further conclude that the Surrogate, having vacated the prior decree, did not err in refusing to admit the March 4, 1980 will to probate for lack of testamentary capacity. Consideration of whether a testator possessed testamentary capacity at the time of the execution of a will requires examination of "(1) whether he understood the nature and consequences of executing a will; (2) whether he knew the nature and extent of the property that he was disposing of; and (3) whether he knew those who would be considered the natural objects of his bounty and his relations with them" (*Matter of Bush,* 85 AD2d 887, 888). Furthermore, although a person has the right to dispose of his property by will regardless of his health, "there comes a time when the ordinary death-bed will, prepared when the testator is sinking slowly but surely to his end, must be submitted to careful scrutiny to determine whether it indeed meets the tests of testamentary capacity" (*Matter of Delmar,* 243 NY 7, 10-11). ¶ The record in this case discloses that the will was executed at 3:05 P.M. on March 4, 1980. At 3:00 P.M., the decedent had no palpable pulse, his blood pressure was 50 over 20, and he had no urine in his bladder, thereby indicating that he was then in shock. The decedent's temperature was 105.4 degrees in the morning and it did not fall below 104 degrees before his death. He was unable to respond to verbal stimuli and there is no indication that the decedent had read the will. In fact, the decedent had refused to read or sign the will in the morning of March 4, 1980 because he was too sick. The decedent's mark was made on the will with the assistance of a nurse. At 3:20 P.M., the decedent exhibited no blood pressure, pulse or respiration, and, at 3:37 P.M., he was pronounced dead. Based on these facts, we cannot say that the Surrogate erred in concluding that at 3:05 P.M., when the will was executed, the decedent was incapable of understanding the nature and ordinary consequences of executing the will, the nature and extent of his property, and the natural objects of his bounty. ¶ Order affirmed, with costs. ¶ Kane, J. P., Main, Mikoll, Yesawich, Jr., and Harvey, JJ., concur.